**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **QUENTIN THOMPKINS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:25-cv-5314** |
| | § | |
| **CONSTABLE MATTHEW SALAZAR,** | § | |
| **an Individual, CONSTABLE MARK** | § | |
| **HERMAN, an Individual AND HARRIS** | § | |
| **COUNTY PRECINCT FOUR** | § | |
| **CONSTABLES OFFICE, a Law** | § | |
| **Enforcement Agency of HARRIS** | § | |
| **COUNTY,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW**, Plaintiff, Quentin Thompkins, and complains of Defendant Constable Matthew Salazar, an Individual, Constable Mark Herman, an Individual and Harris County Precinct Four Constables Office, a Law Enforcement Agency of Harris County ("Harris County") and for cause of action shows the following:

## PARTIES

1. Defendant, Constable Matthew Salazar (ID No. C41559), is an officer with the Harris County Sherrif's Office and may be served wherever he may be found, or at the following address: Mark Herman, 6831 Cypresswood Drive, Spring, Texas 77379. At the time of the incident, Officer Matthew Salazar was acting in his role as a county constable.

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 1**

Plaintiff requests that a citation be issued via e-service to Plaintiff's counsel and Plaintiff be allowed to have Defendant served via private process server.

2. Defendant, Constable Mark Herman, is an officer with the Harris County Sherrif's Office and may be served wherever he may be found, or at the following address: 6831 Cypresswood Drive, Spring, Texas 77379. At the time of the incident, Officer Mark Herman was acting in his role as a county constable. Plaintiff requests that a citation be issued via e-service to Plaintiff's counsel and Plaintiff be allowed to have Defendant served via private process server.

3. Defendant, Harris County Precinct Four Constables Office, is totally funded by Harris County, Texas, which is an extension of the State of Texas and may be served with process at the following address: Mark Herman, 6831 Cypresswood Drive, Spring, Texas 77379. Plaintiff requests that citation be issued via e-service to Plaintiff's counsel and Plaintiff be allowed to have Defendant served via private process server.

## JURISDICTION AND VENUE

4. At this time, Plaintiff seeks monetary relief over $1,000,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney's fees. Plaintiff reserves the right to amend this petition, including this provision, as the case continues.

5. Venue of this case is proper in the Houston Division of the Southern District of Texas because the incident made the basis of this suit occurred in Harris County, Texas, located within the boundaries of the Houston Division of the Southern District of Texas.

6. This action arises under 42 U.S. Code § 1983, by and through the deprivation of Plaintiff Quentin Thompkins' Fourth and Fourteenth constitutional rights. The court also

has supplemental jurisdiction to hear any and all state claims that will be set forth in this complaint. This court has jurisdiction under §1331 and §1343.

## FACTUAL BACKGROUND

7. This lawsuit arises out of an incident that occurred on or about December 29, 2023 at the Woodspring Suites located at 14900 North Freeway, Houston, Texas 77090 within the city limits of Houston, Harris County, Texas. Officer Matthew Salazar introduced an unstable and unnecessary element into an investigation that was being handled professionally and calmly by other operative officers. While his colleagues worked hard to de-escalate the situation, Salazar escalated tensions by recklessly drawing and deploying his Taser in circumstances that did not warrant its use. His conduct was erratic, even amateurish, lacking the proper temper, training, and skill expected of a peace officer. Ultimately, his unprofessionalism and apparent lack of training, experience, or basic courage led to an intentional side kick delivered with enough force to intentionally break the plaintiff's knee. This is a clear and forceful use of excessive use of force that caused a severe and permanent injury.

8. The room at the Woodspring Suites belonged to and was rented by Plaintiff Thompkins.

9. Plaintiff was at the Woodspring Suites with his fiancé, Ms. Viviana Tastad, his fiancé's brother, Mr. Mauricio Tastad, his little sister, Ms. Caitlyn Thompkins and his two children.

10. Ms. Caitlyn Thompkins and Mr. Mauricio Tastad were guests in Plaintiff's residence at all relevant times.

11. At some point in the night, Mr. Tastad began drinking, and continued to drink throughout the night.

12. After witnessing Mr. Tastad's actions become progressively erratic, Plaintiff asked Mr. Tastad to calm down. Mr. Tastad began behaving aggressively towards Plaintiff and referred to him as the "n-word" repeatedly.

13. Ms. Caitlyn Thompkins tried to intervene and asked Mr. Tastad to refrain from using that language in front of the children, at which point Mr. Tastad became aggressive with her. Plaintiff then asked Mr. Tastad to leave his residence.

14. Mr. Tastad refused to leave and began behaving aggressively with Palintiff and became physical and pushing him. Plaintiff then escorted Mr. Tastad off his residence.

15. Upon being forced to leave, in an act of revenge, Mr. Michael Tastad called the police and made a myriad of outlandish claims in order to provoke a police response.

16. Those claims would be that: (1) Mr. Tastad was stabbed twice by Plaintiff, (2) Mr. Tastad was punched in the head but had no visible signs of injury, (3) Plaintiff had a gun and was going to shoot his wife, and (4) that Plaintiff had a gun to his head.

17. Mr. Tastad stated to the 911 dispatcher that he had been drinking all night, and that he was in the parking lot but could not find or remember his vehicle.

18. The dispatcher noted "Mr. Tastad sounds intoxicated."

19. After each of these statements Mr. Tastad would hang up on the 911 dispatcher and would either call back or be called back by them.

20. Upon arriving on the scene, the Officers encountered an intoxicated Mr. Tastad, with no visible signs of injury, no stab wounds, and no gun; only a large half drunken bottle of Hennessy partially hidden in a nearby bush.

21. Upon pulling the bottle out of the bush, Mr. Tastad told the officer, "Thank you Officer, that is mine."



22. Afterwards the Officers turned their attention to Plaintiff Thompkins' younger sister.

23. Plaintiff's younger sister explained all of Mr. Tastad's lies. She denounced the notion that Plaintiff was an aggressor, she stated that there was no fight but admitted that Plaintiff escorted Mr. Tastad off of his residence.

24. Officer Matthew Salazar asked Plaintiff's younger sister to call Plaintiff and have him come to the scene.

25. Being confused, she asked why the Officers needed to speak with Plaintiff if everything Mr. Tastad said were lies. Her exact words were "[why do] you need him to show up just to corroborate what I already told you?"

26. The officers claimed that she was trying to protect her brother and claimed she secretly instructed him not to come back to the residence. She offered to show them her text messages to prove that that is not what she did, but they did not care to check. They detained her in the back of the police vehicle for obstruction of justice.

27. A few minutes later, Plaintiff returned to the residence.

28. Within seconds of Plaintiff appearing on the scene, Officer Matthew Salazar unholstered his taser and began walking towards Plaintiff while staring him down as he approached. He screamed "don't walk up like that," and insinuate that Plaintiff was threatening him.

29. Plaintiff responded, "I didn't threaten you, how am I threatening you?"

30. The other officers intervened and tried to de-escalate the situation, prompting Plaintiff to walk away from Officer Salazar and towards the other officers, however Officer Salazar pursued Plaintiff with his taser drawn.



31. Evidence will demonstrate that, when reviewing the body cam footage, a police officer stated "I'm going tell you what's not helping anything, is that taser being out, because that's all he was focused on."

32. Plaintiff, after trying to speak with the Officers said "get my sister out of the car, my sister did nothing wrong, nobody did anything wrong today except for Mr. Tastad."

33. At this point, no officer told Plaintiff that he was detained, under arrest, or a suspect in any crime.

34. In response to his statements the officers only said "listen" and "she is not under arrest" to which Plaintiff responded, "then why is she in the back of the police car? You guys are out of line, I'm going to call the real police." Plaintiff turned around and tried to walk back to his residence.

35. Officer Salazar stepped in front of Plaintiff and pushed him backwards, with the taser still in his hands and flashlight in his other hand.



36. After pushing Plaintiff, Officer Salazar took a few steps forward to get even closer to Plaintiff as he stared him in the face.

37. Plaintiff still was not told that he was detained, arrested or a suspect.

38. Plaintiff turned to the other officer and say "Really?" he then turned the other direction and stated "I'm going back to my house. I have not done anything wrong."

39. The officers followed.

40. Officer Matthew Salazar and Officer Kenneth Martin attempted to grab Plaintiff. Plaintiff pulled his hands away, a form of de minimis passive resistance.



41. After pulling his arm way, Plaintiff stepped backwards and said, "hold on, hold on, hold on, I have not done anything wrong to y'all."

42. Officer Martin released Plaintiff and attempted to speak with him, however, Officer Salazar continued grabbing Plaintiff's arms, attempting to twist them.

43. Officer Salazar then pulled Plaintiff's body forward, at which point Plaintiff pushed him away and say "Hey, hey, your not stronger than me."

 

44. Officer Cedric Walters then aimed at Plaintiff with his taser.

45. Plaintiff still has not been told that he is detained, arrested or a suspect.

46. Furthermore, Plaintiff is not aware of the lies that Mr. Tastad told which prompted the police response. In his mind, he has no clue why his sister is in the back of a police car, or why the police are there, pointing tasers at him and trying to keep him from going anywhere.

47. Plaintiff turns to Officer Martin and asks, "what is going on?" and Officer Salazar pulls out his taser and points it at Plaintiff.



48. In response to his question the officer stated "we are trying to tell you to chill" and Plaintiff responded "about what? I am going to my house."

49. The officer shouted "see you're not listening!" while holding Plaintiff's right hand.

50. Plaintiff pulled his arm back and said, "let my hand go" and asked, "what did I do wrong?"

51. Plaintiff still has not been told that he is detained, arrested or a suspect.

52. Officer Martin said "I'm telling you, you finna go, I am worried about none of that."

53. Plaintiff turned to Officer Martin and asked, "what is going on?"

54. Officer Martin responded, "you're not listening."

55. However, up to this point the officers have not explained anything to Plaintiff. Plaintiff remains completely unaware that Mr. Tastad alleged he was assault, stabbed twice, or any of the other false allegations. Plaintiff does not know the reason why he is being stopped or that he is a suspect and the officers said nothing this entire time but "chill" and "listen", while failing to follow up that response with any reasonable explanation.

56. Plaintiff turned to the officer once more and shouts "what did I do wrong?!"

57. Officer Kenneth Martin response, "I am telling you, you finna go," which is interrupted by Officer Salazar 'bumping' his taser. *Bumping is just the term for charging or testing the taser, which causes it to make a loud static sound.* At which point Plaintiff turns to Officer Salazar and says "that taser is not going to do anything".

58. Officer Martin says "I am not worried about none of that."

59. Plaintiff turns to towards Officer Martin and asks, "what is going on?"

60. Officer Martin responds, "you are not listening."

61. Plaintiff responds, "I'm not listening because you guys think you are tough."

62. It is finally at this point when Plaintiff asks, "can I go in my house?" and the Officers respond, "no you are being detained."

63. Plaintiff asks "how am I being detained right now, for what?"

64. Officer Salazar states, "because they are saying you were in a fight," and Plaintiff responds, "I wasn't in no fight."

65. The officers then push Plaintiff back into the corner he is standing in and he responds, "stop putting your hands on me."

66. Plaintiff is in a corner, surrounded by police officers, with tasers drawn and pointed at him, as he tries to figure out what's happening.

67. Officer Martin states "you are either gonna get tased, or we are gonna do whatever you're talking about. But were trying to talk some sense into you before this escalates into more than what it should be."



68. Plaintiff says, "tell me how you're trying to talk some sense into me when I haven't done anything wrong."

69. Officer Martin says, "you keep saying that, but we haven't heard your side of the story."

70. Plaintiff responds, "why do you need to hear my side of the story?"

71. Officer Martin states, "[the dude you go into it with] is saying something completely different."

72. Plaintiff confusingly states "I didn't get into it with anybody! What's really going on? I am supposed to be at work right now and you guys are not even for real."

73. Plaintiff turns towards Officer Salazar and says, "and you, you with this taser..."

74. After a few moments of back and forth, Plaintiff once again asks, "what have I done?"

75. Officer Salazar states "you got into a fight with a gentleman."

76. Plaintiff responds, "now you know that is a lie."

77. Officer Salazar responds, "your sister said the same thing, so I've got the person and the witness."

78. Plaintiff responds "are you serious?"

79. Officer Martin states "Mr. Thompkins just tell us what occurred."

80. Plaintiff states "The guy was in my house, we I told him to leave, [that's it]. Can I go in my house?"

81. Officer Martin responds, "No."

82. Plaintiff responds, "well I have nothing else to say. The guy was in my premises, I told him to leave, he didn't leave, he threatened me, I'm done."

83. Officer Martin states, "now you see what you're saying, that makes sense, that makes sense. But calm down, where just trying to do our job."

84. This is where the interaction should have ended between Plaintiff and the police officers.

85. Plaintiff responded, "look to tell the truth, y'all [referring to Officer Martin and Officer Walter] have been trying to talk to me, but this guy came out with this taser [referring to Officer Salazar] and I'm not scared of it."

86. Plaintiff will note that at this point, there is no reasonable and justifiable reason to keep Plaintiff in investigative detention or to prolong or continue this interaction.

87. Plaintiff continues voicing his frustration, stating "you guys know this guy is out of line, you guys know this guy is out of line, none of you guys pulled out a taser. My sister has not done anything, and neither have I."

88. Plaintiff stated "Tell me why you guys have a real case… let my sister out the car, please let her go," at the moment he lowered his voice and put his hands together in a begging motion.

89. Officer Martin stated, "let us put you in handcuffs and we will let her go."

90. Plaintiff, shocked, asked them again to let his sister out of the car, at which point Officer Salazar says "no".

91. Plaintiff turned to Officer Salazar while shouting at him and Officer Matthew Salazar deployed his taser.

92. Upon review, a different police officer reviewing the body cam footage stated "he didn't have to tase him, he didn't have to taste him, he wasn't doing anything, he didn't have to tase him."



93. Officer Salazar claimed that he tased Plaintiff because he charged at him, however, the above image does not show Plaintiff charging or running at Officer Salazar but standing still and speaking to him in a raised voice.

94. The taser was not effective, and Plaintiff retreated back to the wall while pulling the taser prongs off of his shirt.

95. Plaintiff spoke to the other officers, who continued to try to de-escalate the situation and it seemed as if things were calming down.

96. Plaintiff retreated to the corner, in a low voice and his face to the floor, saying, "you know what's so sad, I'm trying to show you guys respect but you're not showing me any."

97. Plaintiff steps back and starts pulling the prongs and wires from the taser off of his shirt.

98. There was a moment of silence.

99. Right as it appeared that the situation had de-escalated, Officer Salazar, completely unprovoked, pulled out his handcuffs and stated, "okaying I'm going to detain you man" and moved towards Plaintiff while reaching at him to grab his arms.

100. Plaintiff pulled his arm away from the police officer.



101. Officer Martin and Officer Walters told Plaintiff to "relax" and "its okay," as Officer Salazar attempted to put handcuffs on him.

102. Initially, Plaintiff was calm, however, Officer Salazar leaned towards his ear and to provokea a confrontation said, "your sister…" immediately in shock and out of reflex Plaintiff pulled his arm away from Officer Salazar.

103. At this point, the officers all piled up on Plaintiff.

104. After being piled on, Plaintiff completely ceased all struggle and stopped resisting as the officers held both of his arms and attempted to cuff him.

105. **At this moment, Plaintiff had the side of his knee exposed, exploiting the vulnerability, Officer Salazar seized the opportunity and did intentionally kick to break and did break Plainitff's knee. This "side kick" or "oblique kick" is specifically designed to cause permanent, and severe injury. Police Officers, inlcuding Officer Salazar, are trained to do a "leg sweep" which disrupts the balance of the suspect but does not cause injury. Deliberately breaking a suspect's knee is excessive use of force almost always unless a very  high bar of preventing immediate death or serious bodily injury is met.**

 



106. The pressure applied to Plaintiff's knee was applied over the course of 4 seconds. Expert Lance Platt will state through a report that this was a clear use of excessive force.

107. Eventually, and inevitably, Plaintiff's knee buckled, but in a way that the knee cannot naturally bend. Due to the extreme amount of lateral force placed on Plaintiff's knee, and the time it was placed, Plaintiff's knee was severely damaged.

108. In the coming seconds all you hear is Plaintiff's groan, you then hear a loud cracking/popping noise, and then you see Plaintiff fall over as his knee bends in on itself.

109. After breaking Plaintiff's knee, Plaintiff stated "you guys just broke my leg," in response one of the Officers stated "you alright, you should have put your hands behind your back."

110. Officer Salazar broke Plaintiff's knee, fracturing his tibia plateau and causing other significant injuries including: **posterior dislocation of the right knee, acute**

**fracture of lateral tibial plateau, postermoedial bone fragmentation, popliteral artery injury, joint effusions, swekkiung, and muscle hemorrhage**.

111. Plaintiff was rushed to the emergency room and required reconstructive surgery just to be able to have a chance of walking again. Plaintiff required follow-up surgery as well.

112. As time passed additional officers and supervisors arrived.

113. One of them was Officer Samuel Joseph, who asked Officer Salazar what happened, and the description of events that Officer Salazar gave were vastly different from what actually happened.

114. Officer Salazar stated that "as soon as Quentin appeared on the scene, he started running towards the deputies, so he came running with his taser."

115. Officer Salazar stated that he let the other officers speak with Plaintiff while "he stepped back and had his taser in the sul position, just in case."

116. Adding that, "he's the one who said he was going to go get the gun and shoot his wife." This is a fact that was disputed by both Plaintiff and his fiancé Viviana Tastad.

117.  Officer Salazar continued to say "So, I came around the corner because he was trying to take off and I said man you have to listen to those deputies. They kept trying to talk to him, but he got irate and ran at the officer so I tased him."

118. Officer Salazar further stated that "he shoved one of your deputies and hit him in the jaw or neck area, but I don't remember which one, but he shoved one of your deputies and that's when I grabbed his arm and then we started fighting. At that point we were trying to get him to the ground, and I guess during that he went like this **[Officer Salazar mimics**

**the positions Plaintiff was in as Officer Salazar used his foot and body weight to apply pressure to his knee joint] and I guess that's when his leg snapped**."

119. **There was no mention of Officer Salazar using a side kick or applying pressure to Plaintiff's lateral side of the knee until it finally snapped. However, after having time to review, Officer Salazar has not changed his story to state that he used a side kick or oblique kick to break Plaintiff's knee.**

120. Officer Samuel Joseph approached Officers Martin and Walter and stated "… he says at that time the guy charged towards him, and he deployed his taser."

121. Both officers shake their heads no, and Officer Martin stated "that didn't happen."

122. Officer Samuel Joseph continued to say, "what happened to the guy's leg, he said the guy's leg snapped."

123. The two officers, Martin and Walter, chuckled, Officer Walter stated "that's C4 [referring to Officer Salazar]" and Officer Martin said "yeah, that's C4, that's C4 all day [referring to Officer Salazar]."

124. Officer Martin stated "**we had him restrained**, I had one arm, we pushed him back into the corner, and that's when he did that side kick or whatever he did, he goes down, and we detain him on the ground."

125. If Plaintiff was restrained, there would be no need for force excessive enough to snap his knee and tear several different muscle groups.

126. Officer Samuel Joseph asked Officer Martin, "whose taking primary on this case, would it be you, because their trying to say that they came out here merely to assist you guys."

PLAINTIFF'S ORIGINAL COMPLAINT – Page 21

127. Noting that Officer Salazar works for the Harris County Constables Office, while Officers Martin and Cedric Walter work for the Harris County Sheriff's Office.

128. Officer Martin responds, "**merely to assist us? He's the one that tased the dude and broke his leg**?"

129. One of the other officers who arrived at the scene sometime after the incident was Officer Ricardo Hernandez.

130. While speaking with other officers, Officer Ricardo Hernandez started reviewing one of the officer's body cam.

131. While reviewing the footage, as soon as he saw Officer Salazar unholster his taser he stated "I'm going to tell you what's not helping, is that taser being out, because that's all he was focused on."

132. Further in the review of the footage, Officer Hernandez stated "fast forward to the part where Officer Salazar claims Mr. Thompkins charged at him," referring to the point immediately prior to Officer Salazar deploying his taser.

133. After reviewing it Officer Hernandez stated, "okay, he didn't have to taste him, he didn't have to tase him. He wasn't doing anything. He didn't have to tase him. That was not…" and then he was cut off by Officer Salazar approaching.

134. Officer Hernandez asked Officer Salazar what happened, wherein Officer Salazar responded that Plaintiff said he was going to fight him and began charging at him. **This was another lie.**

## CAUSES OF ACTION

A.    **42 USC §1983 VIOLATIONS AS AGAINST DEFENDANT MATTHEW SALAZAR**

135. Plaintiff brings this cause of action under 42 U.S.C. § 1983 against Defendant Officer Matthew Salazar for using excessive and unreasonable force in violation of Plaintiff's rights under the statutory and constitutional protections of the Fourth Amendment, as applied to the States through the Fourteenth Amendment. On or about December 29, 2023, during an otherwise controlled and de-escalating police encounter, Officer Salazar, acting under the color of law, introduced unwarranted aggression by drawing and deploying his Taser without justification. When the situation did not merit permanent injury level of force, Officer Salazar escalated matters further by intentionally delivering a forceful side kick to the Plaintiff's knee, breaking it. This use of force was objectively unreasonable under the circumstances and was neither justified nor necessary to affect any lawful purpose. As a direct and proximate result of Officer Salazar's actions, the Plaintiff suffered grievous bodily harm, pain, mental anguish, loss of mobility, and ongoing medical expenses. Officer Salazar's conduct was malicious, oppressive, and showed a reckless disregard for Plaintiff's constitutional rights, thereby entitling Plaintiff to compensatory and punitive damages.

136. Officer Salazar used excessive use of force, including forcibly grabbing Plaintiff and using an extreme and dangerous maneuver to destroy Plaintiff's knees, and it was a proximate cause of the Plaintiff's injuries, including the lasting effects he continues to suffer from the incident.

137. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Royer, 460 U.S. at 500, 103 S.Ct. at 1325-26. The investigative methods employed should be the least intrusive means reasonably

available to verify or dispel the officer's suspicion in a short period of time. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).

138. There is no evidence that Mr. Thompkins committed an assault.

139. However, even though there was no evidence to continue the investigation, the police interaction continued and with Officer Matthew Salazar unskilled and unprofessional behavior resulted in permanent injury to the Plaintiff.

**B.      (Civil Rights Action – 42 U.S.C. § 1983 – Failure to Properly Screen and Hire) AGAINST DEFENDANTS HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE MARK HERMAN**

140. Plaintiff incorporates by reference the allegations of all prior paragraphs.

141. Defendants HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE MARK HERMAN, their agents, and employees failed to adequately and properly screen and hire Defendant Deputy MATTHEW SALAZAR.

142. The failure of Defendants HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE HERMAN to properly screen and hire Defendant SALAZAR, as a matter of policy, custom, and practice in the exercise of their official functions, was deliberately indifferent to the constitutional rights of Plaintiff and done with conscious disregard for the dangers posed to the public by unqualified or dangerous officers.

143. This hiring practice led to the employment of Defendant SALAZAR and caused the harms suffered by Plaintiff in this case.

**C.      (Civil Rights Action – 42 U.S.C. § 1983 – Failure to Properly Train) AGAINST DEFENDANTS HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE MARK HERMAN**

144. Plaintiff incorporates by reference the allegations of all prior paragraphs.

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 24**

145. Defendants HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE MARK HERMAN, as a matter of custom, practice, and policy, failed to maintain adequate and proper training for deputy constables necessary to educate them as to the constitutional rights of detainees and to prevent the use of excessive force.

146. Defendants, HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE MARK HERMAN failed to provide adequate training and supervision to deputy constables entrusted with the power and authority to restrain and arrest individuals. Defendants failed to promulgate and enforce adequate policies and procedures related to misconduct and violations of constitutional rights.

147. These failures were done with deliberate indifference to the rights of Plaintiff and others similarly situated, and establishing the mere training or supervision provided was so inadequate as to amount to a deliberate indifference to the rights of persons with whom the deputies come into contact.

148. The constitutionally inadequate training of Deputy MATTHEW SALAZAR caused Plaintiff's injuries.

**D.** **(Civil Rights Action – 42 U.S.C. § 1983 – Failure to Supervise and Discipline) AGAINST DEFENDANTS HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE MARK HERMAN**

149. Plaintiff incorporates by reference the law and facts contained in the previous paragraphs.

150. Defendants HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR and CONSTABLE MARK HERMAN, as a matter of custom, practice, and policy, failed to supervise deputy constables to prevent, deter, and punish unconstitutional and excessive uses of force.

151. Upon information and belief, Defendants knew or should have known of the dangerous propensities and misconduct of Defendant Deputy MATTHEW SALAZAR, but took no action to retrain, discipline, or correct his aspect of figure care violations of constitutional rights.

152. Defendants condoned and acquiesced in the abusive behavior of defendant police officer by refusing to retrain them, discipline them, or correct the abusive behavior. That acquiescence had advised defendant police officer that side kicks were acceptable under HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT FOUR policies.

153. Defendants were or should have been aware that the policy regarding supervision and discipline of officers who violated the civil rights of the citizens of Harris County was so inadequate that it was obvious that the failure to correct it would result in further incidents of dangerous and permanent injuries.

154. The constitutionally deficient investigation and lack of discipline was done with deliberate indifference to the rights of plaintiff and others in his position.

155. This lack of adequate supervision and discipline was done with deliberate indifference to the rights of Plaintiff and caused Plaintiff's injuries.

E.    **ASSAULT AND BATTERY – (State Cause of Action Under Supplemental Jurisdiction 28 U.S.C. § 1367) AGAINST DEFENDANT DEPUTY MATTHEW SALAZAR**

156. Plaintiff incorporates by reference the allegations contained in all prior paragraphs in this section.

157. Defendant DEPUTY MATTHEW SALAZAR acted with the intent to cause harmful and wrongful actions, when he, during the claimant's detention, attempted and

**PLAINTIFF'S ORIGINAL COMPLAINT – Page 26**

completed an unprovoked **side kick or "oblique" kick** and applied his weight until he broke Plaintiff's knee.

158. The harmful and offensive touch exerted by Deputy SALAZAR was wrongful, and not consented to, and constituted excessive physical force in violation of Texas state law.

159. Neither the side kick nor the extended pressure applied by Defendant SALAZAR was privileged, necessary, or reasonable under the circumstances, and through these offensive actions, Defendant SALAZAR intentionally inflicted bodily injury on Plaintiff.

160. As a direct and proximate result of the assault and battery committed by Defendant SALAZAR, Plaintiff suffered physical pain, permanent injury, medical expenses, mental anguish, and emotional distress, and continues to suffer damages in amounts to be proven at trial.

161. Plaintiff requests actual damages, exemplary damages as permitted pursuant to Texas law, and all other damages allowed by law against Defendant Salazar.

## INJURIES AND DAMAGES

162. As a direct and proximate result of the occurrence made the basis of this lawsuit, and due to the conduct of Defendants, Plaintiff was caused to suffer severe personal injuries, and to incur the following damages:

    a.    Medical expenses: Plaintiff incurred bodily injuries which were caused by the collision and Plaintiff incurred medical expenses for treatment of such injuries. Plaintiff believes that, in reasonable medical probability such injuries will require the need for future medical care;

    b.    Loss of earning capacity: Plaintiff lost wages as a result of the personal injuries sustained in the collision. Plaintiff reasonably believes that such injuries will diminish Plaintiff's earning capacity in the future;

c.    Physical pain: Plaintiff endured physical pain as a result of the personal injuries sustained in the collision and reasonably anticipates such pain will continue in the future;

d.    Mental anguish: Plaintiff endured mental anguish as a result of the personal injuries sustained in the collision and reasonably anticipates such mental anguish will continue in the future;

e.    Disfigurement: Plaintiff endured disfigurement as a result of the personal injuries sustained in the collision and reasonably anticipates such will continue in the future; and

f.    Physical impairment: Plaintiff endured physical impairment as a result of the personal injuries sustained in the collision and reasonably anticipates such in the future.

Plaintiff seeks all damages to which he is entitled at law for personal, emotional, physical, and economic injuries sustained as a proximate result of the Defendants' acts and omissions, as well those personal, emotional, physical, and economic damages which she will continue to sustain in the future as a result of the occurrence in question. Plaintiff has suffered severe physical and mental pain and suffering. Plaintiff will, in all reasonable medical probability, incur reasonable and necessary medical and counseling expenses in the future as a direct result of the assault and deprivation of rights. These damages are in excess of the minimal jurisdictional limits of this Court.

163. In the alternative, if it be shown that the Plaintiff suffered from any pre-existing injury, disease and/or condition at the time of the incident made the basis of the lawsuit, then such injury, disease and/or condition was aggravated and/or exacerbated by the negligence of the Defendants.

## **PUNITIVE DAMAGES**

164. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

165. When viewed objectively from the standpoint of Defendant Officer Salazar, at the time of the occurrence, Officer Salazar's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

166. As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Officer Salazar, who was recklessly or callously indifferent to Plaintiff and his constitutionally protected rights, Plaintiff is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## JURY DEMAND

167. Plaintiff hereby demands a trial by jury and includes the appropriate jury fees.

## RULE 193.7 NOTICE

168. Plaintiff hereby gives notice of his intent to utilize items produced in discovery at the trial of this matter; the authenticity of those items being self-proving pursuant to Rule 193.7.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the Defendants be cited to appear and answer herein, that this cause be set for trial before a jury, and that upon final hearing thereof, Plaintiff recovers judgment against Defendants for:

a. Plaintiff's past medical expenses, which are reasonable and customary for the medical care received by Plaintiff;
b. Plaintiff's future medical expenses;
c. Plaintiff's lost wages in the past and loss of earning capacity in the future;
d. Plaintiff's physical pain and suffering in the past and future in an amount to be determined by the jury;
e. Plaintiff's mental anguish in the past and future in an amount to be determined by the jury;
f. Plaintiff's physical impairment in the past and future in an amount to be determined by the jury;
g. Plaintiff's disfigurement;

h.      Punitive damages;
h.      Interest on the judgment at the legal rate from the date of judgment;
i.      Pre-judgment interest on Plaintiff's damages as allowed by law;
j.      Post-judgment interest at the legal rate;
k.      All costs of court; and
l.      Such other and further relief to which Plaintiff may be justly entitled.


Respectfully submitted,


**BY:**    */s/ Rolando de la Garza*
           **ROLANDO DE LA GARZA**
           Texas Bar No. 24097579

           **DE LA GARZA FIRM, PLLC**
           6777 Camp Bowie Blvd.
           Suite 450
           Fort Worth, Texas 76116
           Telephone: (214) 622-8154
           E-mail: rolando@delagarzafirm.com

           **ATTORNEY FOR PLAINTIFF**